IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **THERESA WEIRBACH and CHARLES ZIMMER on behalf of themselves and all others similarly situated,**<br><br>*Plaintiff*<br><br>v.<br><br>**THE CELLULAR CONNECTION, LLC,**<br><br>*Defendant* | **Case No.  5:19-cv-05310-JDW** |

## MEMORANDUM

The Parties to this case ask the Court to approve their proposed settlement pursuant to 29 U.S.C. § 216(b).  The Court has reviewed the facts and the proposed settlement and concludes that: i) certification of an FLSA collective is warranted; ii) the settlement is fair and reasonable; iii) the two named Plaintiffs are entitled to service awards; iv) the Parties may pay their chosen settlement administrator with a portion of the settlement proceeds; v) the proposed notice is appropriate; vi) Plaintiffs' counsel shall represent the collective; and vii) Plaintiffs' counsel has made a sufficient showing for an award of attorneys' fees and costs.

## I.    BACKGROUND

### A.    Factual Allegations And Procedural History

Theresa Weirbach, Charles Zimmer, and twenty-one additional workers who opted-in to this collective action allege that they worked as Sales Representatives and Technical Advisors (together "Sales Reps") at The Cellular Connection, LLC ("TCC").  TCC is an authorized reseller of Verizon cellular plans and phones with more than 500 retail store locations across the country. Sales Reps sell mobile phones/devices and cell phone/data plans, provide customer service, stock

products, and maintain cleanliness. TCC pays Sales Reps on an hourly basis. Plaintiffs allege that that TCC required them to perform off-the-clock work such as participating in meetings and conferences via phone and a group messaging application called GroupMe, completing work-related paperwork, and making bank deposits. Plaintiffs contend that TCC does not provide a method for recording such time spent working outside the retail stores, so they were not compensated for that time. They estimate that they worked up to five to seven off-the-clock hours per week. Therefore, Plaintiffs assert that TCC violated its obligation under the Fair Labor Standards Act ("FLSA") to pay them overtime.

TCC maintains that it prohibits employees from working off-the-clock and does not require its employees to use any group messaging application outside of its retail locations or after working hours. TCC also contends that employees are unable to perform any meaningful work-related tasks while outside of the store and, if an employee does work off-the-clock, the amount of time doing so is *de minimus*. In any event, TCC claims that it has procedures in place to adjust employees' time records and ensure that it pays them for all hours worked, including overtime.

Ms. Weirbach filed a Complaint in this action on November 12, 2019. On February 28, 2020, she filed an Amended Complaint that added Mr. Zimmer as a plaintiff. Plaintiffs asked the Court to certify a nationwide collective on a conditional basis. However, on August 12, 2020, the Court determined that, pursuant to *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773 (2017), it did not have personal jurisdiction over any out-of-state plaintiffs' claims against TCC. *See Weirbach v. Cellular Connection, LLC*, No. 19-cv-5310, --- F.Supp.3d ----, 2020 WL 4674127, at *5 (E.D. Pa. Aug. 12, 2020). Thus, the Court granted conditional certification for an FLSA collective limited to TCC Sales Reps who worked at retail stores in Pennsylvania or who lived in Pennsylvania while TCC employed them.

Following that decision, the Parties engaged a private mediator who is well-versed in wage and hour issues like this one and spent a full day mediating their dispute. Those efforts led to a proposed settlement of this matter on a nationwide basis.

### B.     The Settlement

As a result of their arms-length negotiations, the Parties stipulate to certification of an FLSA collective of all individuals who worked as Sales Consultants/Representatives or Technical Advisors for TCC between August 21, 2017 and August 20, 2020 (the "Collective"). The Collective includes approximately 4,630 current and former TCC hourly employees.

Then, pursuant to the terms of the settlement, TCC will pay a gross settlement amount of $2,400,000, which includes the following: (1) payments to settlement claimants; (2) fees, costs, and expenses associated with settlement administration; (3) the employees' share of payroll taxes; (4) attorneys' fees and costs; and (5) service awards to the two named Plaintiffs and minimum payments to the opt-in Plaintiffs. In exchange, Plaintiffs and any members of the Collective who choose to participate in the settlement agree to release all federal and state law claims for overtime pay and other wages that accrued during their employment with TCC between August 21, 2017 and August 20, 2020.

Members of the Collective must opt-in to take part in the settlement. Thus, the Parties have agreed on a third-party settlement administrator who will provide notice to all of the members of the Collective, process their claim forms, and distribute their portion of the settlement proceeds according to the allocation formula set forth in the Parties' settlement agreement.

## II.     LEGAL STANDARD

Congress enacted the FLSA to "protect all covered workers from substandard wages and oppressive working hours[.]" *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739

(1981).  There are only two ways that parties can compromise claims under the FLSA: (1) a compromise supervised by the Department of Labor pursuant to 29 U.S.C. § 216(c); or (2) a settlement that a district court approves pursuant to 29 U.S.C. § 216(b).  *See, e.g., Lynn's Food Stores, Inc. v. U.S. ex rel. U.S. Dep't of Labor*, 679 F.2d 1350, 1354 (11th Cir. 1982); *see also Kraus v. PA Fit II, LLC*, 155 F. Supp.3d 516, 522-23 (E.D. Pa. 2016) (courts in Third Circuit generally look to *Lynn's Food* decision for guidance).  In general, "[w]hen parties present to the district court a proposed settlement, the district court may enter a stipulated judgment if it determines that the compromise reached 'is a fair and reasonable resolution of a bona fide dispute over FLSA provisions' rather than 'a mere waiver of statutory rights brought about by an employer's overreaching.'"  *Id.* at 523 (quotation omitted).

"A proposed settlement resolves a bona fide dispute where its terms 'reflect a reasonable compromise over issues, such as ... back wages, that are actually in dispute.'"  *Id.* (same).  "A dispute is 'bona fide' where it involves 'factual issues rather than legal issues such as the statute's coverage and applicability.'"  *Flores v. Eagle Diner Corp.*, No. 18-cv-1206, 2019 WL 3943355, at * 9 (E.D. Pa. Aug. 21, 2019) (quotation omitted).  "[F]or a bona fide dispute to exist, … there must be evidence of the defendant's intent to reject or actual rejection of that claim when it is presented."  *Kraus*, 155 F. Supp. 3d at 530.  If a bona fide dispute exists, courts then consider whether the settlement is fair and reasonable to the employee and whether the proposed settlement would frustrate implementation of the FLSA.  *See Kauffman v. U-Haul Int'l, Inc.*, No. 16-cv-4580, 2019 WL 1785453, at *2 (E.D. Pa. Apr. 24, 2019) (citation omitted).

The FLSA provides that, in addition to any judgment awarded to the plaintiff, the Court "**shall** … allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." 29 U.S.C. § 216(b) (emphasis added).  "The Court is required to 'articulate' the basis for a fee

4

award.  *Kraus*, 155 F. Supp. 3d at 534 (citing *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 196 (3d Cir. 2000)).

## III.   DISCUSSION

### A.  Certification Of The Collective

The Court must address certification of the FLSA collective before approving the proposed settlement.  Usually, at the final certification stage, plaintiffs must demonstrate by a preponderance of the evidence that each opt-in plaintiff is similarly situated to the named plaintiffs.  *Alvarez v. BI Inc.*, No. 16-cv-2705, 2020 WL 1694294, at *4 (E.D. Pa. Apr. 6, 2020) (quotation and citations omitted).  In this case, however, the Parties have stipulated (for settlement purposes only) that the applicable standards for certification are satisfied, i.e. that the named Plaintiffs and the opt-ins are similarly situated.  The record supports this finding.  Indeed, when they moved for conditional certification, Plaintiffs submitted declarations from Ms. Weirbach, Mr. Zimmer, and six other Sales Reps who have opted-in to this litigation that set forth that TCC required them to perform similar off-the-clock work; they had no way to record their time completing this work; and TCC did not pay them for it.  (ECF Nos. 22-4 – 22-11.)  The declarants worked at TCC retail locations in various locations across the country and identified specific other Sales Reps who also were not paid for similar off-the-clock work.  (*Id.*)  Because the Court determined that it did not have personal jurisdiction over the out-of-state plaintiffs' claims, it did not grant conditional certification on a nationwide basis.  However, TCC has consented to personal jurisdiction for purposes of the settlement.  *See Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703-704 (1982) (explaining that personal jurisdiction may be waived).  Thus, the Court will certify the Collective.

### B. Approval Of The Settlement

This case presents a bona fide dispute.  Plaintiffs submitted a claim for unpaid overtime wages under the FLSA based on TCC's alleged failure to pay them for work they performed during off-hours up to five to seven hours a week.  However, TCC maintains that Plaintiffs did not perform any work for TCC outside of its retail stores or during off-hours.  Even if Plaintiffs did perform any off-the-clock work, TCC contends the time spent doing so was *de minimus*. Moreover, because Plaintiffs were scheduled to work 37 hours a week, on average, there is a question as to whether they performed enough off-the-clock work to be entitled to overtime pay. Had this matter not settled, resolution of these issues would have involved a fact-intensive inquiry.

Having determined that a bona fide dispute exists, the Court next concludes that the settlement is fair and reasonable.  "In this Circuit, a settlement is entitled to an initial presumption of fairness where it resulted from arm's-length negotiations between experienced counsel, there was sufficient discovery, and there were no objectors and only a small percentage of opt-outs." *Galt v. Eagleville Hosp.*, 310 F. Supp. 3d 483, 493 (E.D. Pa. 2018).  This settlement is the "result of extensive arm's length negotiations conducted by experienced counsel for the parties following significant investigation, employee interviews, amendment to the complaint, motion practice, review and analysis of TCC's pertinent employment data, preparation and exchange of comprehensive mediation memoranda, a full day mediation session with a skilled mediator experienced with wage and hour litigation, and subsequent further negotiations …."  (ECF No. 60 at 14.)  So, the initial presumption of fairness applies.

After determining that an initial presumption of fairness applies, courts within the Third Circuit look to the *Girsh* factors to evaluate whether the proposed settlement is fair and reasonable. *See Galt*, 310 F. Supp. 3d at 493.  In *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975), the Third

Circuit outlined criteria for the court to consider in assessing the fairness of class action settlements, and Courts have used those same criteria when deciding whether to approve collective action settlements under the FLSA.  Those factors include:

> (1) [T]he complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Id.* (quoting *Girsh*, 521 F.2d at 157).  Those factors confirm the fairness and reasonableness of the Parties' proposed settlement.

The settlement of this matter at a relatively early stage in the litigation conserves the Parties' and the Court's resources.  Had the Parties not endeavored to resolve this matter, Plaintiffs might have sought an interlocutory appeal to review the Court's decision regarding the applicability of *Bristol-Myers Squibb* to the out-of-state Plaintiffs' claims.  As the issue would be one of first impression for the Third Circuit, a review by the Court of Appeals presented significant risks to both sides.  As an alternative to seeking an interlocutory appeal, Plaintiffs also considered filing an entirely new lawsuit in TCC's home jurisdiction in order to pursue their action on a nationwide basis.  Finally, even if Plaintiffs declined to pursue either of those options, there very likely would have been additional motions practice before this Court, including potential motions for decertification and/or summary judgment.  Deciding to settle this matter avoided all of those scenarios and avoided years of litigation.  Moreover, it permitted the Plaintiffs to secure compensation for TCC employees all over the country, not just those who lived or worked in Pennsylvania.

Though resolution of this matter early-on allowed the Parties to avoid the costs of full-blown discovery, the Parties exchanged significant information and extensive briefing ahead of the mediation, giving them "adequate appreciation" of the merits of their respective positions before reaching a settlement. *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 319 (3d Cir. 1998). Indeed, the settlement takes into account risks that Plaintiffs faced in terms of establishing both liability and damages, as well as the risk that TCC could have faced had Plaintiffs filed a new nationwide suit in another jurisdiction. A settlement also permits both sides to avoid the uncertainty and expense of a trial. The settlement amount itself falls within a range of reasonableness considering the foregoing. As Plaintiffs acknowledge, based on the average 37-hour workweek for Sales Reps, and the fact that Sales Reps worked five to seven hours off-the-clock, at most, the best case estimate of unpaid overtime wages is approximately $30-$35 per workweek. However, the reduction to $10 per workweek for settlement purposes is reasonable, considering that Sales Reps worked different off-the-clock hours each week, and a jury might not credit them for some or all of that work. Moreover, even though Sales Reps might not have overtime damages in all workweeks, due to vacations, illness, or simply because they did not work enough hours, those who participate in the settlement will receive a payment for all weeks that they were employed by TCC during the statute of limitations period. In addition, those participants will be permitted to recover for up to three years of work without having to prove a "willful" violation of the FLSA by TCC. The settlement amount will provide meaningful relief to those who participate. Indeed, the gross average allocation is $521.74, with gross allocations reaching up to approximately $1,500.

Aside from the settlement fund itself, the Court must also determine whether the $3,500 service awards for Ms. Weirbach and Mr. Zimmer are fair and reasonable. Service awards, also

known as incentive awards, enhancement awards, or service payments, "are common in class actions that result in a common fund for distribution to the class" and are meant "to compensate named plaintiffs for the services they provided and the risks they incurred during the course of class action litigation." *Alvarez*, 2020 WL 1694294 at *6 (quotation omitted). "[W]here the proposed incentive award comes out of the common fund independent of attorneys' fees, as it does here, the court must 'carefully review' the request for fairness to other class members." *Id.* (citation omitted). The Court cannot approve such awards "without a substantial basis to demonstrate that the individual[s] provided services for the Class and incurred risks during the course of the litigation." *Id.* (quotation omitted).

The $3,500 service awards for Ms. Weirbach and Mr. Zimmer are fair and reasonable, and there is a substantial basis to establish the services they provided during the litigation. As the Court has noted before, individuals who serve as named plaintiffs in employment rights cases do so at the risk or their current or future employment. *See Mejia v. KVK-Tech, Inc.*, No. 19-cv-4841, 2020 WL 5292074, at *3 (E.D. Pa. Sept. 4, 2020). Aside from taking this risk, Ms. Weirbach and Mr. Zimmer also provided invaluable service in aid of Plaintiffs' prosecution of this matter— sitting for extensive pre-suit interviews, providing crucial documents, submitting declarations, giving insight into TCC's defenses, and making themselves available for the full-day mediation. Service awards are warranted, and a modest award of $3,500 is well-within the range of similar awards approved in other collective/class actions in this district. *See, e.g., Alvarez*, 2020 WL 1694294, at *7 (approving service of award of $15,000 to each named plaintiff); *Myers v. Jani-King of Philadelphia, Inc.*, No. 09-cv-1738, 2019 WL 4034736, at *10 (E.D. Pa. Aug. 26, 2019) (approving service award of $10,000 to each plaintiff); *Tompkins v. Farmers Ins. Exch.*, No. 14-cv-3737, 2017 WL 4284114, at *8 (E.D. Pa. Sept. 27, 2017) (approving service awards ranging

from $4,000 to $5,000 per representative).  Finally, though they are not service awards, the Court

finds that the minimum payments of $500 to those Plaintiffs who opted-in prior to the Court's

ruling on conditional certification to be reasonable as well.  Those opt-in Plaintiffs took similar

risks in joining this suit, and a minimum payment of $500 is reasonable when compared to the

gross average allocation of settlement funds that members of the Collective stand to receive.

Likewise, the Court finds that the request to pay the settlement administrator from the

settlement proceeds to be "fair and reasonable in light of the efforts expended." *Galt*, 310 F. Supp.

3d at 499.  Indeed, after receiving a database from TCC containing relevant information for

members of the Collective, the Parties' agreed-upon settlement administrator will undertake efforts

to confirm the accuracy of the Collective members' contact information, ascertain any missing

information, and make settlement allocations proportionate to the number of weeks they were

employed by TCC as Sales Reps during the statute of limitations period.  The settlement

administrator will then send out notice packets to every member of the Collective and attempt to

resend any notices that are returned as undeliverable.  The settlement administrator will also send

out reminder postcards to any Collective members who do not submit a claim form before the

deadline.  Lastly, the administrator will be responsible for making all legally mandated payroll

deductions prior to distributing settlement payments to the individual participants and will handle

any necessary tax reporting as a result.  These are substantial tasks to complete.  The Court

approves the agreed-upon administrator, Atticus Administration, LLC, in light of the fact that both

Parties have had positive experiences with Atticus in prior matters, and Atticus submitted the most

cost-effective bid to perform this work.

Finally, the proposed settlement does not impermissibly frustrate implementation of the

FLSA in the workplace.  That is because "it does not include broad waiver provisions, or a

confidentiality agreement, nor did the parties attempt to file the settlement agreement under seal[.]" *Nwogwugwu v. Spring Meadows at Lansdale, Inc.*, No. 16-cv-2663, 2017 WL 2215264, at *3 (E.D. Pa. May 18, 2017) (internal citations omitted).  Because the proposed settlement agreement does not contain a confidentiality provision, it allows Plaintiffs to discuss the terms of the agreement with members of the public, including other TCC employees, without facing liability for breach of contract. *See Galt*, 310 F. Supp. 3d at 495-96.  In addition, the released claims are limited to claims "for overtime pay and other wage claims that accrue or accrued during the employment of the non-exempt Sales Consultants and Technical Advisors, relating back to August 21, 2017 and continuing until August 20, 2020," including any related state law claims.  (ECF No. 61-1 at III.B.13.)  This provision is sufficiently tailored so as not to frustrate implementation of the FLSA.

### C.  Approval Of The Notice

The Court approves the Parties' proposed notice because it: informs the Collective members about the settlement; identifies the claims that they are releasing; sets forth the formula for calculating each individual's settlement payment; and provides instructions for submitting a claim. *See Keller v. TD Bank, N.A.*, No. 12-cv-5054, 2014 WL 5591033, at *3 (E.D. Pa. Nov. 4, 2014).  The notice also discloses the payment of the attorneys' fees and expenses, the service awards for Named Plaintiffs, and the minimum payments for the Plaintiffs who opted-in prior to the ruling on conditional certification.  The Court agrees that these essential terms are written using simple and straightforward language rather than cumbersome legalese.  However, the Notice and the reminder postcard use the term "Claims Administrator" to refer to the "Settlement Administrator," which is a defined term in the Settlement Agreement.  For the sake of consistency, and to avoid any confusion, the Notice and the reminder postcard should be revised to refer to the

Settlement Administrator only.  Otherwise, the Court agrees that the notice program is robust and is likely to ensure that all members Collective receive notice of the claims and their rights with respect to the settlement.

### D.  Approval Of Attorneys' Fees

Courts in the Third Circuit generally use the percentage-of-recovery method to evaluate attorneys' fee requests in wage and hour cases like this one.  *See Mabry v. Hildebrandt*, No. 14-cv-5525, 2015 WL 5025810, at * 3 (E.D. Pa. Aug. 24, 2015) (citation omitted).  "In this Circuit, the percentage of the recovery award in FLSA common fund cases ranges from roughly 20-45%." *Id.* (collecting cases).  In requesting one-third of the gross settlement fund, Plaintiffs' counsel seeks an award in the middle of the usual range.  Moreover, the requested fee is reasonable in light of each of the *Gunter* factors: "(1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; (7) the awards in similar cases." *Gunter*, 223 F.3d at 195 n.1.  The requested fee is also reasonable in light of the Court's ruling on conditional certification, which limited the Collective to Sales Reps who lived or worked in Pennsylvania. Despite this adverse ruling, Plaintiffs' counsel nevertheless secured a settlement on behalf of all TCC Sales Reps, regardless of where they are located, and thousands of members of the Collective are eligible to receive meaningful benefits as a result.  Given these efforts, it is also appropriate for Plaintiffs' counsel to serve as counsel for the Collective.

Since this is a "mainstream case," the Court will also perform a lodestar crosscheck.  *See id.*  To determine the lodestar award, the Court multiplies the number of hours the attorney(s)

reasonably worked on the case by "a reasonable hourly billing rate for such services given the geographical area, the nature of the services provided, and the experience of the lawyer."  *Id.* "[M]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied[.]"  *In re Prudential Ins.*, 148 F.3d at 341 (quotation omitted).  The lodestar crosscheck confirms that the requested attorneys' fees are reasonable.  Plaintiffs' counsel calculated a lodestar of $459,245 based upon their usual hourly billing rates.  However, because the Court must analyze whether the rates are reasonable in light of the geographical area, the nature of the services provided, and the experience of the lawyers, the Court has utilized the fee schedule developed by Philadelphia Community Legal Services and calculated a lodestar of $370,553.  *See* Community Legal Services of Philadelphia, Attorney Fees, *available at* https://clsphila.org/about-community-legal-services/attorney-fees/.  If the fee award to Plaintiffs' counsel is $800,000, as requested, the lodestar multiplier will be 1.74 using Plaintiffs' lodestar and 2.16 using the CLS schedule.  Both multipliers fall within the generally accepted range and confirm the reasonableness of the fee award.  Thus, the Court will approve the proposed fee, as well as Plaintiffs' counsel's recoupment of costs expended in this action, $4,418.28.

## IV.     CONCLUSION

The Court will approve the settlement, including the service awards to the named Plaintiffs, payment to the Parties' chosen settlement administrator, the form and content of the notice, and the proposed attorneys' fee award.  An appropriate Order follows.

BY THE COURT:

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

November 10, 2020

13